3:22-mj-00191

DISTRICT OF OREGON, ss:          AFFIDAVIT OF CHAD LINDSLY

**Affidavit in Support of a Criminal Complaint and Arrest Warrant**

I, Chad Lindsly, being duly sworn, do hereby depose and state as follows:

**Introduction and Agent Background**

1.      I have been employed as a Special Agent by Homeland Security Investigations (HSI) since December of 2010. I am currently assigned to the ICE/HSI Office of the Assistant Special Agent in Charge, in Portland, Oregon. Previously, I was assigned to the ICE/HSI Office in Calexico, California, where I worked for over six years. My formal law enforcement training includes successfully completing the 23-week HSI basic training course at the Federal Law Enforcement Training Center in Glynco, Georgia. During the training, I learned how controlled substances are manufactured, consumed, packaged, marketed, and distributed. Since then, I have participated in dozens of drug investigations involving controlled purchase operations, vehicle tracking, cell phone geo-location techniques, cell-site simulators, and pen register/trap and trace orders. I have interviewed and operated informants, executed search warrants, arrested and interviewed subjects, conducted physical surveillance and utilized electronic and video surveillance. I have been the affiant on over 200 search warrants related to narcotics, marijuana cultivation, Hobbs Robbery, kidnapping, bank robbery, firearms, burglaries, and financial crimes. I have been the affiant on two narcotics-related wiretap investigations and have been the co-case agent on two additional narcotics-related wiretap investigations. I have also worked with and consulted numerous agents and law enforcement officers who have investigated drug trafficking, firearms offenses, and financial crimes. I have assisted in more than four fentanyl overdose cases and have been the case agent on four fentanyl overdose investigations that

involved over ten overdose deaths in the District of Oregon and the Western District of Washington.

2.      I submit this affidavit in support of a criminal complaint and arrest warrant for **Mary Phoenix Nguyen**, for committing and conspiring to commit the crimes of aggravated identity theft in violation of 18 U.S.C. § 1028A and access device fraud in violation of 18 U.S.C. § 1029.   As set forth below, there is probable cause to believe, and I do believe, that **Mary Phoenix Nguyen** violated 18 U.S.C. § 1028A and 18 U.S.C. § 1029.

3.      I am a party to the investigation described herein. My knowledge of the matters described in this affidavit are the result of a combination of my own firsthand knowledge, review of police reports, as well as facts described to me by other witnesses and law enforcement personnel assisting with the investigation. I have not included all information learned through this investigation. I have included information I believe is sufficient to establish probable cause for the criminal complaint and arrest warrant requested by this affidavit.

### Applicable Law

4.      Title 18 U.S.C. § 1028A provides, in relevant part, that "[w]hoever during and in relation to any felony violation enumerated in section (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years."

5.      Title 18 U.S.C. § 1029 provides, in relevant part, that

(a) Whoever-
(2) knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period;

(3) knowingly and with intent to defraud possesses fifteen or more devices which are counterfeit or unauthorized access devices;

(4) knowingly, and with intent to defraud, produces, traffics in, has control or custody of, or possesses device-making equipment;.

shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section.

(b)

(1) Whoever attempts to commit an offense under subsection (a) of this section shall be subject to the same penalties as those prescribed for the offense attempted.

(2) Whoever is a party to a conspiracy of two or more persons to commit an offense under subsection (a) of this section, if any of the parties engages in any conduct in furtherance of such offense, shall be fined an amount not greater than the amount provided as the maximum fine for such offense under subsection (c) of this section or imprisoned not longer than one-half the period provided as the maximum imprisonment for such offense under subsection (c) of this section, or both.

(c) Penalties.-

(1) Generally.- The punishment for an offense under subsection (a) of this section is—

(A) in the case of an offense that does not occur after a conviction for another offense under this section-

(i) if the offense is under paragraph (1), (2), (3), (6), (7), or (10) of subsection (a), a fine under this title or imprisonment for not more than 10 years, or both; and

(ii) if the offense is under paragraph (4), (5), (8), or (9) of subsection (a), a fine under this title or imprisonment for not more than 15 years, or both;

(B) in the case of an offense that occurs after a conviction for another offense under this section, a fine under this title or imprisonment for not more than 20 years, or both; and

(C) in either case, forfeiture to the United States any personal property used or intended to be used to commit the offense.

## Statement of Probable Cause

6.     I have conducted financial investigations involving sophisticated money

laundering techniques and fraud. Based on my training, experience, and my investigations, I

have become familiar with how those engaged in fraudulent activity obtain identifying

information of victims, such as a full name, date of birth and social security number, and then

use that information to open numerous bank and credit card accounts. The victim's information

is generally obtained from theft, either from the victim themselves (phishing, from the mail,

unattended vehicles, purse snatches, home burglaries, etc.), somebody, such as an employer or

doctor's office, that maintains their information, or via the United States Postal Service (USPS)

mail stream. Furthermore, I know that individuals that commit fraud maintain victim information

for long periods of time because it is of value in perpetuating additional acts or further fraud

schemes. The purpose of opening the accounts is to further a fraud scheme, which often involves

several co-conspirators. The goal of this scheme is to defraud banks and merchants in order to

obtain cash or other items of monetary value such as gift cards and electronics. These items are

often sought out due to their high liquidity. During account openings, those individuals

committing fraud typically provide a mailing address that they exercise control over to obtain a

bank issued debit or credit card in furtherance of the fraud scheme, which typically involves

depositing stolen or counterfeit checks via an ATM to defraud the bank of cash. Due to the

complexity of the fraud, the sheer number of victims, and criminal conduct spanning multiple

jurisdictions, it is not uncommon for these crimes go unsolved and/or uninvestigated. This

requires the perpetrators to be in communication, which is often done by the use of a cell phone.

Additionally, those involved in fraudulent acts and schemes generally use a computer to facilitate

**Page 4 – Affidavit of Chad Lindsly**                              **USAO Version Rev. April 2018**

the scheme by setting up fake email accounts, applying for bank accounts online, credit cards online, or other necessary things in order to make the scheme successful, such as manufacturing counterfeit identification documents or counterfeit checks, credit cards, or other financial instruments. Through my training and experience I know that a shaved key that gives access to USPS mailboxes at apartment complexes and shared mailing locations is a common "tool of the trade" for those involved with fraudulent acts and schemes. I know that the primary purpose of stealing mail is to obtain PII information to perpetuate fraud and to obtain checks that can be used multiple ways for fraudulent activity.

7.     In April 2022, I initiated an investigation into the criminal fraud activities committed by **Mary Phoenix Nguyen** and others in the greater Portland, Oregon, and Vancouver, Washington area. This included Search and Seizure Warrant, Application, and Affidavit application for case number 3:22-mc-400-A-G AMENDED and Search and Seizure Warrant, Application, and Affidavit application for case number 3:22-mc-976-A.  In summary, my investigation revealed that **Nguyen** and other criminal associates were using victims' Personal Identifying Information (PII) to obtain credit cards, obtain unlawful access to victims' bank accounts and remit funds, apply for multiple vehicle loans, fraudulently obtain vehicles, rent at least six apartments/residences fraudulently using some or all of victims' information that sustained a loss of more than $120,000, fraudulently apply for and obtain financing to purchase at least three vehicles totaling more than $150,000, and produce fraudulent documents (i.e., social security cards, drivers' licenses, vehicle titles, vehicle bills of sale, checks, etc.). Additionally, I learned that **Nguyen** had been previously investigated by other law enforcement agencies for the Target Offenses, including Portland Police Bureau (PPB).

**Page 5 – Affidavit of Chad Lindsly**                    **USAO Version Rev. April 2018**

8.      My investigation is still ongoing, which aims to fully identify the scope of **Nguyen** and other criminal associates' fraud ring. However, my initial investigation revealed that **Nguyen** and others are also fraudulently obtaining victims' PII for the sole purpose of committing the Target Offenses. **Nguyen**'s direct and indirect involvement in the Target Offenses has been corroborated through several court-authorized searches, multiple law enforcement encounters, and the seizure of hundreds of items of evidence. My basis of knowledge comes from my own independent investigation, my review of other law enforcement officer's official police reports, and conversations with law enforcement personnel with direct and indirect knowledge of **Nguyen** and **Nguyen**'s related conduct. A summary of relevant conduct committed by **Nguyen** are as follows:

9.      In March 2021, Portland Police Bureau (PPB) investigated the fraudulent purchase of a 2021 Alfa Romeo ("Alfa Romeo"). Several days later, on March 17, 2021, PPB observed the Alfa Romeo parked at a Motel 6 parking lot in the greater Portland area. The Alfa Romeo's estimated manufacturer's suggested retail price (MSRP) was $53,240. PPB contacted the dealership, reviewed loan paperwork, and interviewing the purported victim of identity theft. PPB's investigation determined that the Alfa Romeo was fraudulently purchased by **Nguyen** using the victim's PII.  The vehicle loan was financed through Wells Fargo Bank, NA, and victim's PII was used in the paperwork. Shortly thereafter, PPB detained **Nguyen** as she accessed the Alfa Romeo in the Motel 6 parking lot.

10.      In a subsequent search of the Alfa Romeo, **Nguyen**, and other items, numerous items consistent with fraud were discovered, including counterfeit driver's licenses, equipment commonly used to produce fraudulent documents, and other items of evidentiary value.

11.     On April 26, 2022, I applied for and subsequently obtained multiple court-authorized search warrants for several Subject Persons and Subject Premises attributable to **Nguyen** and others, referencing case numbers 3:22-mc-400-A-G AMENDED. The court-authorized search warrants included three apartments directly attributable to **Nguyen** and others at the Heirloom Apartments located at XXXX SE Luther Road, Portland, Oregon, and a secondary residence of **Nguyen** located in the greater Portland area. One of the residences located at Heirloom Apartments was **Nguyen**'s primary residence, identified as XXXX SE Luther Rd Apt XXXX, Portland, Oregon ("**Nguyen**'s Former Residence"). The warrants authorized the search for evidence related to several violations, including 18 U.S.C. § 1028A – Aggravated Identity Theft.

12.     In summary, each of the residences located at the Heirloom Apartments and **Nguyen**'s secondary residence (located at XXXX NE 32nd Ave Apt XXX, Portland, Oregon 97232) were applied for and subsequently rented fraudulently using victims' PII, including but not limited to, name, date of birth, SSN, addresses(es), etc. The rental applications were submitted electronically via the internet. My investigation revealed that **Nguyen** was directly and/or indirectly attributable to the online fraudulent submissions. Additionally, counterfeit Oregon driver licenses using the victims' PII but photographs of **Nguyen** and other co-conspirators were used in these rental application, and some of these counterfeit licenses were recovered during my court authorized searches of the residences.

13.     I executed the court-authorized searches at the three Heirloom Apartments locations on April 28, 2022, and at **Nguyen**'s secondary residence a few days later. I later executed another court-authorized search on a fourth apartment at Heirloom Apartments directly

attributable to **Nguyen** that was obtained fraudulently in the same manner, referencing case number 3:22-mc-471-A. In total, Heirloom Apartments sustained a direct loss of greater than $100,000, which included rental income, damage to the properties, legal expenses, theft of appliances, relocation expenses for other tenants, and other incurred expenses.

14.     During my court authorized searches, I located a large amount of evidence corroborating my current investigation throughout all the searched residences, including hundreds of pieces of stolen mail, hundreds of documents containing victims' PII, hundreds of fraudulently obtained, altered, and stolen checks, dozens of counterfeit driver licenses, hundreds of fraudulently obtained and/or stolen credit and debits cards, dozens of altered vehicle titles, and numerous pieces of electronic equipment consistent with the production of counterfeit and forged IDs, documents, and other items (i.e., laminators, printers, scanners, ID card printers, blank card stock, inks, foils, counterfeit security features, laminating sleeves, etc.).

15.     I also identified a white 2019 Volkswagen Atlas ("**Nguyen**'s 2019 Volkswagen"). **Nguyen**'s 2019 Volkswagen was obtained fraudulently by **Nguyen** using victim PII to obtain a loan in the amount of $48,078.  This loan was financed through TD Bank, NA. This was corroborated by an internal fraud investigation conducted by the financial institution, my review of the loan paperwork, law enforcement queries, and an interview I conducted with the victim.

16.     During the service of the court-authorized searches, **Nguyen** was encountered and subsequently detained at one of the residences, identified as **Nguyen**'s Former Residence. **Nguyen** was advised of her rights per *Miranda*. I reviewed a copy of the Search and Seizure Warrants with **Nguyen** and discussed the facts of my investigation, including **Nguyen**'s direct involvement with fraudulently obtaining rental properties, stealing victim's PII via the mail

stream, fraudulently obtaining loans, credit cards, and other lines of credit using victims' PII,

producing fraudulent ID cards, and other crimes involving fraud-related activities. I also

explicitly advised **Nguyen** to discontinue her criminal conduct and that I and other law

enforcement investigators would continue to investigate her fraudulent activities. **Nguyen** stated

that she understood.

17.      During the court-authorized search, I seized and searched several cellular phones,

including **Nguyen**'s Phone.[1]  Several days later, on May 4, 2022, I initiated a court-authorized

search of **Nguyen**'s Phone. During my manual review of **Nguyen**'s Phone, I located messages,

photographs, and other content consistent with **Nguyen** and other known and unknown co-

conspirators committing the Target Offenses, including explicit messages about depositing stolen

and altered checks and other fraud related activity.

18.      I then continued my investigation into **Nguyen** and began my review of the items

seized from **Nguyen**'s Former Residence. My subsequent review and analysis identified an

internal fraud investigation by Wells Fargo that linked directly to a Wells Fargo debit card I

seized from **Nguyen**'s Former Residence in **Nguyen**'s bedroom. Specifically, I seized a Wells

Fargo VISA debit card bearing Account Number XXXX-XXXX-XXXX-4847 ("WF Debit-

4847").[2] I have reviewed Wells Fargo internal fraud investigation report, which included a

summary of the purported fraud and several photographs of an individual conducting a cash

---

[1] The search warrants authorized the seizure of and search of electronic devices and media,
including the cellular phone identified as **Nguyen**'s Phone.

[2] At this time, I do not know if the person whose name is on the card is a co-conspirator or a
victim; however, as detailed herein I executed a court authorized search **Nguyen**'s secondary
residence located at on April 28, 2022. During my search, I seized mail, paperwork, and other
items consistent with the accounts attributable to this person's name as being fraudulent.

withdrawal of $1,000 conducted at an ATM in the greater Portland area on January 5, 2022. As detailed below, I have identified the individual committing the fraud as **Nguyen**.

19.     In summary, Wells Fargo identified a Wells Fargo Checking Account ending in -2947 ("WF Account-2947"), which was opened on December 6, 2021. On January 4, 2022, a check in the amount of $2,000 from an apparent Bank of America account, was deposited via mobile deposit into WF Account-2947. Then, the following day, a check in the amount of $58,482, from an apparent Wells Fargo account, was deposited via an ATM at the Lloyd Center into WF Account-2947. Due to internal fraud alerts, the $58,482 check was deemed altered and payment was suspended. Shortly thereafter and at the same ATM, the same individual withdrew $1,000 from WF Account-2947 using WF Debit-4847 (i.e., the same debit card I seized during my court authorized search on April 28, 2022.) Wells Fargo also later deemed that the $2,000 check contained an altered payee. Wells Fargo sustained at least a $1,000 loss.

20.     I reviewed several ATM still frames of the individual committing the fraud and identified the individual as **Nguyen**. I identified the individual as **Nguyen** several ways, including the seized WF Debit-4847, the physical appearance of the individual committing the fraud, and several unique pieces of clothing worn by the individual, including a black and white striped jacket, a blue Chanel scarf, and a maroon wallet. The unique articles of clothing were photographed in **Nguyen**'s bedroom closet at **Nguyen**'s Former Residence during my court authorized search on April 28, 2022. A side-by-side comparison of the ATM still frame with the identified unique clothing articles (i.e., the black and white striped jacket, the blue Chanel scarf, and the maroon wallet containing **Nguyen**'s Oregon driver's license) looked like this:



21.    I learned that **Nguyen** and other criminal associates vacated the searched

residences in May 2022 and had moved to XXX Logus Street, Oregon City, OR 97045

("**Nguyen**'s Residence").

22.    Following the April 28, 2022, court-authorized searches and my verbal warning to

**Nguyen** about continued criminal activity, I learned **Nguyen** continued to commit fraud related

activities by fraudulently altering and depositing an Oregonians Credit Union (OCU)[3] cashier's

check on at least three separate occasions.

23.    I have spoken with an authorized representative of OCU and have reviewed a

summary of OCU's internal fraud investigation of an incident that involved an individual I have

identified as **Nguyen** using a victim's identity. First, the counterfeit Texas driver's license used

to attempt to open the bank account was similar to one of the same counterfeit Texas drivers

licenses I seized from **Nguyen**'s Residence on April 28, 2022, which contained the PII of an

identified victim. This victim's PII was recovered during the search of **Nguyen**'s Residence on

April 28, 2022.  Second, the same identity on the Texas driver's license is listed on the utilities at

**Nguyen**'s Residence. Third, the email address used by the individual was similar to previous

---

[3] Oregonians Credit Union is federally insured by the National Credit Union Administration
(NCUA).

emails used by **Nguyen** to commit her fraud (first name, last name, month/date of birthdate all merged, i.e., JohnDoe0130@gmail.com). Fourth, **Nguyen**'s Former Residence address and **Nguyen**'s phone number (i.e., **Nguyen**'s Phone) were used on the rental application for **Nguyen**'s Residence. Fifth, the general modus operandi of the fraud committed by the individual is consistent with the previously identified fraud committed by **Nguyen**. Sixth, as detailed below, I executed a court authorized search of **Nguyen**'s Residence on October 18, 2022, and subsequently seized the original altered OCU Cashier's Check and Bank of America letters addressed to **Nguyen** at **Nguyen**'s Former Residence notifying **Nguyen** that the altered OCU cashier's checks were returned as unpaid. For ease of reference, I will refer to the individual that committed the fraud as **Nguyen**.

24.     In summary, I learned that on April 26, 2022, **Nguyen** applied online via a cellular phone for an OCU bank account using her real name, which is similar to the name of the Victim[4], **Nguyen**'s Former Residence as the mailing address, **Nguyen**'s Phone, a copy of the utility bill in **Nguyen**'s name for **Nguyen**'s Former Residence, and the Victim's SSN, the Victim's DOB, and the Victim's current address. The initially submitted application was prior to my court-authorized searches on April 28, 2022. **Nguyen** also submitted a photograph of a purported Texas driver's license, which had a photograph of an individual who appears to be **Nguyen** that contained the PII of the Victim, including the Victim's name, DOB, address, and current address. As detailed below, I noted that the Texas driver's license submitted for the OCU account opening (and the Victim's PII) was similar to multiple counterfeit Texas driver's

---

[4] To avoid identifying the victim, I do not explain the similarities between the names in this affidavit.

licenses I seized from **Nguyen**'s Residence on April 28, 2022, the same listed on the utilities at **Nguyen**'s Residence, and the same identity submitted electronically on the rental application for Nguyen's Residence. I also noted that the submitted and seized driver's licenses had some differences, including the placement of the signature and the listed eye color (i.e., the submitted driver's license listed eye color as "BRO" whereas the seized driver's license listed "BLK" eyes). As detailed herein, this conduct (i.e., hybrid synthetic identity theft) was consistent with the identified fraud previously committed by **Nguyen**. **Nguyen** also provided OCU a $60 deposit to open the account, which was later refunded via a certified Cashier's Check to **Nguyen** at **Nguyen**'s Residence as detailed below[5]. A redacted side-by-side comparison of the submitted Texas driver's license to OCU (on the left) and the seized Texas driver's licenses from **Nguyen**'s Residence on April 28, 2022 (on the right), looked like this[6]:



25.     An internal review by OCU of the application identified discrepancies in reviewing a credit report related to the submitted information for the account application. Shortly thereafter, on or about May 6, 2022, OCU attempted to contact **Nguyen** via email to request an

---

[5] At this time, I do not know how the $60 was sourced to fund the attempted account opening.
[6] I also seized identical Texas driver's licenses on my court authorized search of **Nguyen**'s Residence on October 18, 2022.

in-person meeting to verify **Nguyen**'s identity; however, OCU was unable to get in contact with **Nguyen** and **Nguyen**'s bank account application was denied. Shortly thereafter, on May 6, 2022, OCU refunded the initial account opening balance of $60 via a certified Cashier's Check payable to "Mary **Nguyen**" and mailed the check to **Nguyen**'s Former Residence.

26.     On May 20, 23, and 25, 2022, OCU determined that multiple versions of the certified Cashier's Check that was mailed to **Nguyen** were submitted for online deposit in a Bank of America account attributable to **Nguyen** for the amounts of $600, $800, and $300, respectively. My investigation identified the Bank of America account as Bank of America Checking Account XXX-XXXX-XXXX-5404 in the name of **Nguyen**. Because the fraudulent Cashier's Checks were processed through a third-party bank (i.e., Bank of America), OCU did not sustain a loss; however, Bank of America did. Through my conversations with OCU and a review of the documents, I learned that the Cashier's Checks were modified several ways from the original Cashier's Check. As detailed below, I seized the original OCU Cashier's Check during my court authorized search on October 18, 2022. My inspection of the check determined that the check was altered. First, the issued check number was changed on each fraudulent Cashier's Check. Second, the authorized signatories were changed from the original authorized signatories to names of the former CEO and Accounting Manager of OCU. At this time, it is unknown to OCU how **Nguyen** knew the names of the former employees of OCU. Third, the authorized Cashier's Check amount was changed from $60 to $600, $800, and $300. Fourth, the issuance dates of the Cashier's Checks were changed. A side-by-side comparison of each fraudulently copied Cashier's Check with the modifications noted looked like this:







27.    My continued investigation into **Nguyen** identified **Nguyen**'s Residence in September 2022. Shortly thereafter, HSI served an administrative subpoena to Portland General Electric (PGE) requesting subscriber records for the **Nguyen**'s Residence. Several days later, on September 23, 2022, I received and reviewed the records and determined several things. First, the customer's name for the **Nguyen**'s Residence is listed as "Mary 'X' **Nguyen**." I noted that **Nguyen**'s true middle name is "Phoenix." I then reviewed the related PII associated to the customer and determined that the utilities are fraudulently listed in another individual's identity that had previously been identified to have been stolen and used by **Nguyen**. Specifically, I noted that the utilities for the **Nguyen**'s Residence were listed in the *same* identity as the fraudulent Texas driver's license and related PII that I seized during my court-authorized search on April 28, 2022. This is the same PII information used by **Nguyen** to continue to commit fraud on April 26, May 20, 23, and 25, 2022 at OCU, as detailed above. My continued investigation also tentatively identified **Nguyen**'s replacement vehicle as a black 2021 Volkswagen Atlas ("**Nguyen**'s 2021 Volkswagen").

**Page 16 – Affidavit of Chad Lindsly**                                **USAO Version Rev. April 2018**

28.    Based in part on the aforementioned facts, on October 18, 2022, I executed a court authorized search of **Nguyen**'s Residence and **Nguyen**'s 2021 Volkswagen, referencing case number 3:22-mc-976-A and 3:22-mc-976-C, respectively. During my court authorized searches, I located a large amount of evidence corroborating my continued investigation into **Nguyen** and the Target Offenses, including dozens of pieces of stolen mail (from the greater Portland and Vancouver area), dozens of documents containing victims' PII, dozens of fraudulently obtained, altered, counterfeit, and/or stolen checks, numerous counterfeit driver licenses, more than a dozen fraudulently obtained and/or stolen credit and debits cards, altered and/or counterfeit vehicle titles, and numerous pieces of electronic equipment consistent with the production of counterfeit and forged IDs, documents, and other items (i.e., printers, scanners, credit card embossing machine, inks, etc.). I noted that the majority of the documentation seized contained dates after my court authorized searches on April 28, 2022. A photograph of the seized credit card embossing machine (on the left and recovered in Nguyen's garage) looked like this:



29.    Through my continued investigation and conversations with the lien holder, I determined that the **Nguyen**'s 2021 Volkswagen was obtained fraudulently by **Nguyen** using a victim's PII to obtain a loan in the amount of more than $50,000. The victim PII was the same

victim's PII used on the OCU Cashier's Check Fraud, the PGE utility records, and the rental application of Nguyen's Residence. I subsequently seized **Nguyen**'s 2021 Volkswagen and remitted the vehicle to the lien holder. At the time of my seizure, the lien holder was unaware that the **Nguyen**'s 2021 Volkswagen had been fraudulently obtained. I also seized and searched several cellular phones, including a new phone identified to be **Nguyen**'s ("**Nguyen**'s Replacement Phone").

30.     During the service of the court-authorized searches, **Nguyen** was encountered and subsequently detained at **Nguyen**'s Residence. **Nguyen** was advised of her rights per *Miranda*. In general, **Nguyen** denied being involved with the Target Offenses, including fraudulently obtaining the Alfa Romeo, the Wells Fargo fraud in January 2022, fraudulent use of PII to obtain rental agreements at **Nguyen**'s Former Residence and the other related apartments, the OCU cashier's check fraud, and fraudulent applications used to obtain both **Nguyen**'s 2019 Volkswagen and **Nguyen**'s 2021 Volkswagen.

31.     My investigation is still ongoing, which aims to fully identify the scope of **Nguyen** other criminal associates' fraud ring. However, my initial review of the items seized during my court authorized search on October 18, 2022, identified several key pieces of evidence. Specifically, I located the original altered OCU Cashier's Check that was fraudulently altered and deposited on May 20, 23, and 25, 2022. I also located three separate Bank of America letters addressed to **Nguyen** at **Nguyen**'s Former Residence notifying **Nguyen** that the altered OCU cashier's checks were returned as unpaid. The OCU Cashier's Check and the Bank of America letters were located in Nguyen's bedroom closet. A photograph of the seized altered OCU Cashier's Check (and the modification marked in a yellow box) looked like this:



32.     I also conducted a court authorized search of **Nguyen**'s Replacement Phone and an initial review of some of the seized stolen, altered, and/or counterfeit checks. During my review, I located a United States Treasury check payable in the amount of $6,143.42 dated May 24, 2022. The check appeared to be a REFUND for Form 941, which was an Employer's Quarterly Federal Tax Return. A physical inspection of the check revealed that the check had been altered in several places, including removing a part of the MEMO and removing and subsequently replacing the payee information.

33.     I then conducted a manual search of the photographs on **Nguyen**'s Replacement Phone and identified a screenshot of a deposit in a US Bank Account. Specifically, I identified a photograph of a US Bank Account viewable from the US Bank Application dated October 12, 2022, 4:01 p.m. The screenshot of the US Bank Account showed several transactions, including a "Mobile Check Deposit" on October 11, 2022, in the amount of $6,143.32. I note that the check amount is the *exact* same amount as the recovered altered US Treasury Check in the amount of $6,143.32. Based on my training, experience, and investigation to date, I believe that **Nguyen** deposited the altered US Treasury Check on or about October 11, 2022 and took a screenshot from her phone. At this time, I do not know the status of the deposited altered US

Treasury Check or which US Bank account the check was deposited in. A side-by-side of the
seized altered US Treasury Check (on the left) and the screenshot of a US Bank Account on
**Nguyen**'s Replacement Phone showing a deposit in the amount of $6,143.32 (on the right)
looked like this:



34.    On October 18, 2022, I spoke with the property owner and an authorized
representative of **Nguyen**'s Residence.  In summary, I learned that **Nguyen** submitted a rental
application online with the same victim PII as previously used, including the same counterfeit
Texas driver's license I seized from **Nguyen**'s Residence on April 28 and October 18, 2022,
which is also listed on the utilities at **Nguyen**'s Residence.  I also learned that the property owner
has sustained at least a $20,000 loss to date, including rental income, legal expenses, and
damages to the property.

**Conclusion**

35.    Based on the foregoing, I have probable cause to believe, and do believe, that
**Mary Phoenix Nguyen** committed and conspired to commit aggravated identity theft in
violation of 18 U.S.C. § 1028A and access device fraud in violation of 18 U.S.C. § 1029.
Therefore, I request the issuance of a criminal complaint and arrest warrant.

36.     Prior to being submitted to the Court, this affidavit was reviewed by Special

Assistant United States Attorney (SAUSA) Rachel Sowray, and SAUSA Sowray advised me that

in her opinion the affidavit is legally and factually sufficient to establish probable cause to

support the issuance of the requested complaint and arrest warrant. I respectfully request the

Court to authorize the attached arrest warrant based on this complaint.

By telephone
_____
Chad Lindsly, Special Agent
Homeland Security Investigations

Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at 10:46
a.m/p.m. on October 19, 2022.

_____
Honorable Stacie F. Beckerman
U.S. Magistrate Judge

**Page 21 – Affidavit of Chad Lindsly**                    **USAO Version Rev. April 2018**